## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

_____

REV. MR. (DEACON) GREGORY E. HALL, AMERICAN MFG COMPANY,

           Plaintiffs,

      v.

SYLVIA M. BURWELL, *et al.*,

           Defendants.

_____

Case No. 13-CV-295 (JRT/LIB)

**DECLARATION OF
ERICK G. KAARDAL**

     I, Erick G. Kaardal, make the following declaration pursuant to 28 U.S.C. Section 1746:

1.    I am a 33.33% shareholder and a founding shareholder of Mohrman, Kaardal & Erickson, P.A., a law firm located in downtown Minneapolis, Minnesota with six full-time attorneys.

2.    I have been in engaged in the private practice of law in the Minneapolis market since 1992.

3.    Attached as **Exhibit 1** to this Declaration is Mohrman, Kaardal & Erickson's Invoices for its representation of Plaintiffs in the above referenced matter.

4.    The attached invoices, Exhibit 1, were contemporaneously sent to the clients for payment as reflected in the A/R transaction listing attached as **Exhibit 2**.  All of the invoices were paid except the December 4, 2014 invoice totaling $307.50.

1

5.    The firm generates its invoices to clients from the time and billing software package, TimeSlips, for presenting our firm's time and expenses.  The time entries are entered contemporaneously upon the conclusion of daily legal services provided.

6.    This Declaration will set forth the facts supporting Plaintiffs' Motion for Attorney Fees and Expenses. I have knowledge of the facts supporting this application for fees and expenses.

7.    Mohrman, Kaardal & Erickson's practice focuses on representing small, medium and large business interests as well as individuals with legal needs.  In addition, Mohrman, Kaardal & Erickson has a recognized specialty in handling complex constitutional civil rights litigation as well as complex appellate work.  Attached as **Exhibit 3** is a listing of significant constitutional and appellate cases attorneys in our firm have handled.

8.    With respect to me, I attended Harvard College on an U.S. Army Reserve Officer Training Corps scholarship. I graduated from Harvard College in 1988 with magna cum laude honors in economics. At the same time, I was commissioned as a Second Lieutenant in the U.S. Army Reserves.   I enrolled at the University of Chicago Law School while fulfilling his commitments in the U.S. Army Reserve.  I graduated from the University of Chicago Law School in 1992.  I began my legal career at Faegre & Benson LLP in Minneapolis in 1992 as an associate attorney.  I went on to work at Trimble & Associates in the Minneapolis area as an associate attorney.  Trimble & Associates represented the Republican Party of Minnesota during the latter part of the 1990's.

Trimble & Associates was at that time involved in representing political parties and public interest groups. In 2000, I joined William F. Mohrman as a shareholder in forming Mohrman & Kaardal, P.A. My background and experience as an appellate attorney are represented in the cases attached as Exhibit 3.

9.    Here are a few examples. First, I was the lead counsel to the Republican Party of Minnesota in the *Republican Party of Minnesota v. White* case, 536 U.S. 765 (2002) while at Trimble & Associates. I wrote the first Complaint in the case and crafted many of the successful legal theories. (During the pendency of the appeals, on January 1, 2000, I joined Mr. Mohrman and created our existing law firm. Mr. Mohrman at the time was representing Greg Wersal in the same case.) The U.S. Supreme Court opinion in that case was a watershed as it was the first U.S. Supreme Court opinion applying the First Amendment's Free Speech Clause to judicial candidates. Second, I was hired to represent the Minnesota Legislators in a case involving the titles of proposed constitutional amendments to define marriage and to require more stringent voter identification -- successfully arguing the case to the Minnesota Supreme Court, *Limmer, et al v. Ritchie, et al,* 819 N.W.2d 622 (2012). Third, recently, Mr. Mohrman and I represented 281 Care Committee successfully in an Eighth Circuit appeal titled *281 Care Committee v. Arneson,* Case No. 14-779 (2013). Here, the Eighth Circuit for the first time struck down a ban on false political speech as being violative of the First Amendment's Free Speech Clause. The government's petition for writ of certiorari is pending before the U.S. Supreme Court.

10.     My practice focuses on litigation at both the trial and appellate level.   While the primary focus of my practice has been on business litigation, a significant part of my practice has included representing individuals and organizations in constitutional and civil rights litigation in various state and federal courts, including constitutional and statutory cases.

11.     Associate attorney Mr. James V. F. Dickey of our office also worked on this matter.  I personally know Mr. Dickey's work as an attorney.  Mohrman, Kaardal & Erickson hired Mr. Dickey to work at the firm in August, 2012.  Mr. Mohrman and I have personally supervised Mr. Dickey's work for our firm.  We agree that Mr. Dickey's litigation work has been excellent – especially in spotting issues, framing arguments and writing briefs.  Moreover, Mr. Dickey has shown a particular expertise in constitutional litigation.  Mr. Dickey's resume is attached as **Exhibit 4**.  As can be seen from his resume, Mr. Dickey graduated from the University of Minnesota School of Law in 2012 *magna cum laude*.  Prior to law school, Mr. Dickey attended and graduated from Duke University in 2007.

12.     Finally, Mohrman, Kaardal & Erickson also utilized the services of John Grzybek, a paralegal in our offices.  Mr. Grzybek has been employed with Mohrman, Kaardal & Erickson since 2005 as a paralegal.  Mr. Grzybek graduated from Central Connecticut State College in 1977 with a degree in political science and history.  Mr. Grzybek then attended Adelphi University in New York and obtained a degree in the legal assistant program in 1977.  Mr. Grzybek started as paralegal with Faegre & Benson in 1977 where

4

he worked as a paralegal from 1979 to 1986.  Mr. Grzybek then obtained a law degree

from Vermont Law School in South Royalton, Vermont in 1989.  Mr. Grzybek moved

back to Minnesota and practiced law in Minnesota from 1989 through 1993.  From 1993

to 2005, Mr. Grzybek had his own business advising small businesses and non-profits.  In

2005, Mr. Grzybek joined Mohrman, Kaardal & Erickson, P.A. as a paralegal and has

worked as a paralegal for Mohrman, Kaardal & Erickson, P.A. continuously since 2005.

13.     The services performed in the above captioned matter were reasonably and

necessarily performed by Mohrman, Kaardal & Erickson in representing Plaintiffs.

14.     Furthermore, the rates billed for the services performed by the attorneys at

Mohrman, Kaardal & Erickson in the above captioned matter are accurately listed in

Exhibits 1 and 2 according to each service that was performed on Plaintiffs' behalf.

15.     However, those rates charged on Exhibits 1 and 2 were rates discounted from the

current prevailing market rate.

16.     The rates charged were significantly under the current prevailing market rate for

these attorneys and paralegals for performing complex constitutional litigation on

comparable cases in the Minneapolis market for attorneys with comparable skill,

experience and reputation.

17.     The current reasonable prevailing market hourly rates are $450.00 per hour for me,

$225.00 per hour for Mr. Dickey and $195.00 per hour for our paralegal, Mr. John

Grzybek.

18.     In order to provide evidentiary support for our argument that the rates set forth

above are the prevailing reasonable market rates for the attorneys and paralegals, we

obtained the Declaration of Dan Biersdorf, an experienced litigator, who has litigated in

the Minneapolis/St. Paul market for over 30 years, testifying that the rates set forth above

are the prevailing reasonable market rates for the attorneys and paralegals at Mohrman,

Kaardal & Erickson, P.A.  We have also obtained a Declaration of Noel Johnson as to the

complexity of the legal issues and the reasonableness of the hours.  In addition, I have

attached as Exhibits 5 through 8 recent Minnesota federal court decisions approving

attorney fee applications.

19.    Attached as **Exhibit 5** is *Owner Operator Indep. Drivers Ass'n, Inc. v. Supervalu,*

*Inc.,* CIV. 05-2809 JRT/JJG, 2012 WL 6760098 (D. Minn. 2012). Using the lodestar

analysis in a case involving a statutory insurance claim, U.S. District Court Judge

Tunheim, relying on Affidavit of Timothy R. Schupp, found that an hourly rate of $495

per hour was a reasonable prevailing market rate for four attorneys with legal practice

experience ranging from 46 years to 23 years.  The Court also found $435 per hour a

reasonable prevailing market rate for an attorney with 12 years of experience.

20.    Attached as **Exhibit 6** is *Madison v. Willis,* No. 09–930, 2011 WL 851479, (D.

Minn. Mar. 9, 2011). In *Madison,* U.S. District Court Judge Donovan Frank recently

noted that "$600 per hour is the upper end of what is reasonable in the prevailing

community" in Minneapolis/St. Paul.  *Madison v. Willis,* No. 09–930, 2011 WL 851479,

at * 1 & n. 4 (D. Minn. Mar. 9, 2011).

21.    Attached as **Exhibit 7** is *Rosen v. Wentworth*, CIV. 12-1188 ADM/FLN, 2014 WL

1384084 (D. Minn. 2014).  In *Rosen,* U.S. District Court Judge Ann Montgomery awarded a $450 per hour rate for an attorney with over 20 years of experience in the Minneapolis/St. Paul market.  Moreover, U.S. District Court Judge Ann Montgomery approved a prevailing hourly rate in the Minneapolis/St. Paul market of $225 per hour for an attorney with less than three years of experience who graduated from law school the same year as Mr. Dickey.

22.    Attached as **Exhibit 8** is *King v. Turner,* 05–CV–0388, 2007 WL 1219308, at *2 (D. Minn. Apr. 24, 2007). In *King,* the Court approved a rate of $500 per hour as a prevailing hourly rate for an attorney in Minneapolis/St. Paul market.

23.    The reasonable hourly rates Mohrman, Kaardal & Erickson are seeking under the lodestar method in this motion compare very favorably with those the U.S. District Court for the District of Minnesota has approved in the last four years. First, in *Owner Operator Indep. Drivers Ass'n, Inc.,* the Court approved an hourly rate of $495 per hour for attorneys with anywhere from 45 to 23 years of experience.  As set forth above, I have 23 consistent years of experience working as an attorney and I am seeking approval of my hourly rate at $450 per hour.  Mr. Dickey has less than three years of experience and is seeking $225 per hour, the same rate as the attorney in *Rosen* who graduated from law school the same year as Mr. Dickey.

24.    All time expended by Mohrman, Kaardal & Erickson was recorded by its attorneys contemporaneously with the work being performed by the attorney performing the work.

25.    One of the arguments that defendants often advance on fee petition cases is that the case is "overlawyered."  As can be seen from the bills, Mr. Dickey and Mr. Grzybek did significant amounts of work on the file totaling 57 hours.   The remaining time of 125.8 hours was billed by myself.  Given the complexity of the issues of first impression in this matter, it was indispensable for me to be intimately involved in litigating these matters. Moreover, Mohrman, Kaardal & Erickson earns most of its revenues from hourly fee paying clients.

26.    In addition, I have at all times been the attorney primarily responsible for this matter at Mohrman & Kaardal.  I have made every reasonable effort to ensure that the matter was handled efficiently and economically.

27.    Also, I would note that we did not overlitigate this matter at the District Court level.  We always viewed this case as a "legal" case.  Therefore, we did not take any depositions in the matter.  Rather, we researched, collected and analyzed case law, federal statutes and regulations.  In addition, our firm undertook an extensive review of First Amendment Free Exercise Clause cases, RFRA cases, HHS regulations, IRS tax penalty provisions and Minnesota's insurance regulations.  Obviously, this took a significant amount of time to research and analyze.

28.    I also testify that, as part of my responsibility to review the time entries submitted with this fee application, that I reviewed and approved each and every time entry charged on the attached Invoices prior to billing them to my client.  Thus, I have exercised appropriate billing judgment to ensure that all charges were reasonable and

necessary to this litigation.  In my review, if I believed that the time recorded in a time entry by an attorney was "excessive, redundant, [duplicative] or otherwise unnecessary", I did not bill the time to the client.  I have re-reviewed the Invoices as part of this process and have satisfied myself that the prior review was sufficient as to the charges being reasonable and necessary to the litigation.  I believe this is true even in hindsight.

29.    I would also note that attorneys at our firm, including myself, are expected to utilize billing judgment as they record their time.  If they believe that they were not as efficient as they should be with respect to a particular matter, they are expected to reduce their time accordingly at the time of making their time entries.  Thus, hours spent on the matter by attorneys at this firm which, in their billing judgment, should not be billed, were reduced at the time made.

30.    After making the aforementioned adjustments, my firm reasonably expended exactly 182.08 hours on behalf of Plaintiffs in pursuing their successful claims in the United States District Court.  *See,* Exhibit 1.

31.    Multiplying the prevailing reasonable hourly rates for the attorneys and paralegals at Mohrman, Kaardal & Erickson by the 182.08 hours expended, the reasonable value of the services Mohrman, Kaardal & Erickson performed litigating Plaintiffs' claims is $68,670. Attached as **Exhibit 11** is an Excel spreadsheet reflecting these calculations for MKE attorneys and MKE legal assistant.  *See* Exhibit 1.

32.    Mohrman, Kaardal & Erickson also incurred taxable costs in the amount of $459.51  which are sought in a separate Taxation of Costs filed with the Court.

33.     Thus, the total of the above services performed and expenses incurred by

Mohrman, Kaardal & Erickson through judgment are $69,116.29.  *See,* Exhibit 1.

34.     Finally, I would like to provide the Court with some context regarding why the

legal services process and result in this case were excellent.

35.     Hall is a Roman Catholic Deacon of the Archdiocese of Galveston-Houston which

is led by Cardinal Daniel DiNardo – a former Chair of the U.S. Conference of Catholic

Bishops' Committee on Pro-Life Activities. Hall is also the sole owner of a for-profit

corporation with about 45 employees in a competitive worldwide market: Plaintiff

American Mfg Company. With the federal government's passage of the Patient

Protection and Affordable Care Act (ACA) – and specifically the adoption of the ACA

regulatory mandate requiring employee insurance coverage for contraception,

abortifacients and related education and counseling (also known as the HHS mandate") --

Deacon Hall was in trouble. On the one hand, he was told by the Archdiocese that

providing the type of insurance coverage provided as a Deacon would be scandalous, it

would subject him to suspension as a Deacon. On the other hand, he did not want to sell

the company because it was the primary source of income for his family and him.

36.     Failing to comply with the HHS mandate with the appropriate insurance coverage

for his employees, meant hundreds of thousands of dollars in fines. And, Hall had a

deadline: March 31, 2013.  It was the expiration date for his group health insurance

policy with Medica. Hall would not compromise on his religious beliefs; he found it

likewise, untenable that he would in turn have to sacrifice his business as the source of

his family's income for a government mandate because of his religious beliefs. Hall

chose to sue.

37.     After deciding to sue, the Archdiocese, already considering disciplinary actions

against Deacon Hall, gave him an opportunity to challenge the HSS mandate. In so doing,

Hall directed his attorneys to do whatever was necessary to resolve his issue and to do so

before March 31, 2013. Hall's litigation story began in January 2013 and ultimately

ended on November 26, 2014 with a judgment in vindication of his religious freedoms.

38.     The Honorable John R. Tunheim entered an order adjudicating Hall's claim under

the Religious Freedom Restoration Act in his favor:

> "IT IS FURTHER ORDERED that judgment is entered in
> favor of plaintiffs and against defendants on plaintiffs' claim
> under the Religious Freedom Restoration Act, 42 U.S.C. §§
> 2000bb *et seq.*"

39.     Hall achieved what he had sought: a change in the legal relationship between

himself (and his company) and the federal government under the ACA. The Defendants

violated his rights under the Religious Freedom Restoration Act, as agreed to by the

district court with the entering of the underlying judgment.

40.     Getting Hall a judgment in his favor was no easy task despite appearances of the

district court docket. In a sister court before the Honorable David S. Doty lay the first

action in Minnesota filed on November 2, 2012, challenging certain regulations under the

Patient Protection and Affordable Care Act ("ACA")  *Annex Medical, Inc., et al. v.*

*Kathleen Sebelius, et al.*  Hall's Complaint would be the second and lead case after *Annex*

*Medical.*

11

41.    The Annex Medical Complaint asserted that the ACA, that is, the HHS mandate, required businesses and their owners to include in their group health plans coverage for products and services that violated the owners' sincerely-held religious beliefs under threat of substantial monetary fines and penalties placing those business owners in a precarious positions. The claims asserted included violations of the Religious Freedom Restoration Act, the Free Exercise Clause, the Establishment Clause, and the Free Speech Clause of the United States Constitution, and violation of the Administrative Procedures Act.

42.    The *Annex Medical* Plaintiffs sought a preliminary injunction in November soon after filing their Complaint. The district court issued an order on January 8, 2013 denying the sought after injunctive relief.

43.    Meanwhile, the district court opined in its denial for preliminary injunctive relief that while "other districts … reached differing opinions regarding plaintiffs' likelihood of success on the merits in challenges to the [HHS] Mandate, [this court concludes] that RFRA was not designed to 'protect against the slight burden on religious exercise that arises when one's money circuitously flows to support the conduct of other free-exercise-wielding individuals who hold religious beliefs that differ from one's own.'" Hence, the district court would also find that because the plaintiffs did not "demonstrate a substantial likelihood of success on the merits, [it indicated] that irreparable harm is unlikely."

44.    Finally, as to the issue of the balance of equities, and the district court noted that plaintiffs requested an injunction that would in essence *alter* the status quo (by directing

12

Annex Medical's insurance carrier to make available an insurance plan without contraceptive services), the district court remained unpersuaded of the harm alleged: "Annex has been paying for such [contraceptive] services, albeit unintentionally, for over a year. As a result, the court is unpersuaded that plaintiffs' alleged irreparable harm outweighs the government's interest in providing for the health of women and children."

45.    Annex Medical immediately appealed, and a subsequent motion for a preliminary injunction pending appeal was also denied in district court, but the appellate court would grant preliminary injunctive relief pending the appeal.

46.    Eventually, the U.S. Court of Appeals for the Eighth Circuit would render its opinion in October 2014. A majority of the appellate panel, dismissed one plaintiff for lack of standing, and questioned whether the injury of the company plaintiff Annex-Medical was caused by the government defendants: "[I]t is unclear whether Annex's alleged injury is caused by the government defendants and redressable by the federal courts." As a result, the appellate court vacated the district court denial and remanded the case "for additional analysis."

47.    The district court's rendered decision on January 8, 2013, placed Hall in a conundrum. The group policy issued by Medica for Hall's American Mfg Company's 45 employees was to expire on March 31, 2013, and the current policy, unbeknownst to him also had coverage provisions for contraceptive products and services. Coupled with the ACA and the HHS Mandate, monetary penalties for non-compliance with the law, and Hall's position with the Catholic Church as a Deacon, he faced immediate consequences

13

because of his religious beliefs. For instance, because the HHS Mandate is contrary to Church doctrine, as a Deacon, he faced harsh consequences from his Archdiocese, and as for his company with 45 employees faced monetary penalties of $4,500 per day or $135,000 per month. On March 31, 2013, he faced an impossible choice: relinquish his religious beliefs for his company or sell his company for his religious beliefs.

48.    The *Annex Medical* district court decision required a different inquiry of the facts to ensure Hall's case did not meet a similar fate as Annex Medical.

49.    Hall hired Thomas Matthews of Hughes Matthews, P.A., a St. Cloud, Minnesota law firm, to address his legal options. Matthews commenced his own independent research on the legal and factual issues. Meanwhile, he also engaged in conversations with Mohrman, Kaardal, & Erickson, P.A. of Minneapolis, Minnesota about the legal and factual issues.  Soon thereafter, I was retained as counsel in January 2013. As necessary, both Matthews and I coordinated our efforts to minimize if not eliminate any duplication of research, resources, or costs to the clients.

50.    While the *Annex Medical* district court decision provided the avenue of what to avoid, Hall's complications came with his recognition of the Archdiocese intolerance of having a deacon, as a disciple to Church followers, having a business following a government mandate in direct opposition to Church doctrine. The Archdiocese would discipline him accordingly unless something changed. Hall's legal counsel where thus faced with unique facts and complications between a challenge to the HHS mandate and preventing Hall from being deposed by the Church.

14

51.     Before and during the drafting of Hall's underlying complaint, counsel was faced with unique challenges. First, counsel had to obtain an agreement from the Archdiocese to refrain from disciplinary actions against Hall. Second, counsel had to obtain facts and testimony from the Archdiocese regarding factual allegations in the complaint as it related to Church doctrine and what would happen to Hall as a deacon if he failed in district court. Third, counsel had to obtain from the Archdiocese an agreement to sign a declaration for a summary judgment memorandum seeking permanent injunctive relief.

52.     Counsel also had to face the limitations of insurance carriers as regulated in Minnesota. It required a comprehensive knowledge of and discussions with Medica, American Mfg Company's group health insurance policy carrier, as to what the carrier would do or could do in light of the HHS mandate. It also required discussion with the other insurance companies in Minnesota which sold group health insurance.  This too became part of the foundation for the underlying complaint. Further, as for drafting the complaint, each claim had to meet the Eighth Circuit's and the district court's standards of review under *Iqbal* and *Twombly* to discourage or to survive a Rule 12(b) motion under the Federal Rules of Civil Procedure.

53.     After filing the 239 paragraph complaint, asserting violations of the Religious Freedom Restoration Act, the Free Exercise Clause, the Establishment Clause, and the Free Speech Clause of the United States Constitution, and violation of the Administrative Procedures Act, counsel sought a preliminary injunction. However, what Hall eventually learned, was that his company's insurance carrier, Medica, was unwilling to make an

exemption with just a preliminary injunction in place. The rationale being that if Hall lost his litigation fight, Medica would find itself exposed to legal issues contrary to the ACA and the HHS mandate.

54.    Medica's position meant a loss for Hall. In other words, a preliminary injunction did little for him but allow the present coverage to continue beyond the deadlines and held off disciplinary action of the Church until a final outcome. Hence, during February 2013, Hall's counsel prepared for summary judgment proceedings with the drafting of the appropriate summary judgment memorandum and affidavits to obtain a permanent injunction. Hall agreed with the legal strategy.

55.    But, as the drafting of the summary judgment memorandum continued through its numerous drafts, as is the practice of the MKE firm, I further sought to understand the insurance industry as regulated in Minnesota to obtain a negotiated resolution from Medica if possible, which in turn could lead to injunctive relief against the Defendants. Thus, it required review of the six non-profit insurance carriers and polices submitted in Minnesota to the Minnesota Department of Commerce and the Department's processes in approving the policies or any proposed changes in coverage. In short, without finding a path to obtain a religious accommodation exception through an insurance carrier, Hall was doomed to failure because of the *Annex Medical* decision.

56.    The dual strategy and effort would later be proved successful. Medica became the first non-profit insurance company of the six in Minnesota to provide a religious accommodation provision as an exemption from the HHS mandate. And because of the

Hall achievement, it would lead to the settlement of six other HHS mandate federal actions in Minnesota. *Annex Medical* remains the only remaining open federal district court file.

57. With the issuance of Hall's requested injunctive relief and finding that the Defendants violated the Religious Freedom Restoration Act, the legal relationship between Hall and the Defendants shifted. Hall and, thus, the American Mfg Company, are no longer obligated to follow the HHS mandate. Hall remains a deacon and has met his obligations under Catholic doctrine in providing care to his employees with insurance coverage, and as a side benefit, his company remains competitive in the market place because of such employee benefits.

58. Plaintiffs seek attorney's fees based on MKE's time through judgment for $68,670 and costs of $459.51 incurred during the district court proceedings.

59. Hall seeks attorney's fees from MKE invoices as enumerated below:

| Attorney/Assistant | Years Practicing | Market Hourly Rate |
|---|---|---|
| Kaardal | 23 years | $450 |
| Dickey | 2 years | $225 |
| Grzybek (Legal Assistant) | 35 years | $195 |

60. The rates requested for the individual attorneys are reasonable. First, I was significantly involved in the *Republican Party of Minnesota v. White* case in the Eighth

Circuit and Supreme Court and his hourly rates were approved by this Court at $325 per hour based on a fee application submitted in August, 2005, nine years ago. The United States Court of Appeals for the Eighth Circuit in the matter *281 Care Committee v. Arneson* recently approved my hourly rate at $450.  Attached as **Exhibit 13** are copies of the Eighth Circuit Order awarding attorney's fees and the related motion.

61.    Moreover, recent U.S. District Court for the District of Minnesota decisions on attorney fee applications approved hourly rates at $495 and above for attorneys with experience similar to me.

62.    Meanwhile, my hourly rate is reasonable and appropriate for the skill required, the customary rate charged by Hall's counsel, the issues and consequences involved and the results obtained, the experience, reputation, and ability of his attorneys, the "undesirability" of prosecuting a civil rights action against the federal government and federal officials, and the nature of the service involved.

63.    Further, the U.S. District Court for the District of Minnesota has approved a prevailing market rate of $495 per hour for attorneys with only 23 years of experience. That Court also found $435 per hour was a reasonable prevailing market rate for an attorney with 12 years of experience and attorneys with less than three years of experience have been awarded rates similar to $225 per hour.

64.    Thus, based on recent Minnesota District Court decisions, I have the same experience of 23 years as one of the attorneys in recent case in *Owner Operator Indep. Drivers Ass'n,* where the attorney's hourly rate was approved at $495 per hour. Here, I

18

am only seeking $450 per hour. The rates of the other attorneys and paralegal(s) in this matter are also reasonable.

65.     The second step of the lodestar analysis is to determine the number of hours reasonably expended on the matter. The burden is on the applicant to present to the Court "evidence of the hours worked" "identifying the general subject matter of his time expenditures." However, the attorney "is not required to record in great detail how each minute of his time was expended." The key is that the attorney submitting the fee request is to exercise "billing judgment" to exclude hours that are "excessive, redundant or otherwise unnecessary."

66.     Hall's counsel went through the firm's billing history report of the time entries for their respective work on the underlying matter. Every time entry was reviewed to ensure the time was not "excessive, redundant, [duplicative] or otherwise unnecessary." We note that it is the practice of Mohrman, Kaardal, & Erickson attorneys and its legal assistant to make contemporaneous time entries for work performed each day. Further, they are to exercise their professional judgment at that time to reduce or eliminate time entries that are excessive, redundant, duplicative or otherwise unnecessary. Before making his declaration for instance, I spoke with firm employees to ensure time entries reflected recorded contemporaneous entries and work performed.

67.     And as the time entries reflect, no "block billing" was engaged in and billed time is reflected in 1/10th hour increments. Even if any entry is contested as "block billing," my billing records are sufficiently specific to communicate what was done and its

connection to the case.

68.    In reviewing the billing history of the time entries in this case, prior to invoicing to the client, if I believed that any time was excessive, redundant, duplicative, or otherwise unnecessary, I reduced the time prior to invoicing. Courts have voiced a concern in exercising billing judgment on § 1988 requests for attorney's fees of the failure to remove time entries spent on claims for which the party did not prevail. That is not the case here.

69.    As we mentioned above, there were unique circumstances to this case that ultimately lead to the successful favorable outcome Hall sought. The immediate issue with the failure of *Annex Medical* and dealing with Hall's continuing position within the Church. I  had to obtain an agreement from the Archdiocese to refrain from disciplinary actions against Hall. I  also had to obtain facts and testimony from the Archdiocese regarding factual allegations to be alleged in the underlying federal complaint as it related to Church doctrine and what would happen to Hall as a deacon if he failed in district court. Finally, I knew the importance of obtaining from the Archdiocese an agreement to sign a declaration for a summary judgment memorandum seeking permanent injunctive relief.  He was successful in all three areas.

70.    But that would not end Hall's ordeal. Even with the filing of the federal complaint, Minnesota's regulatory tentacles of Plaintiff American Mfg Company's group health insurance carrier Medica — and the other five non-profit insurance carriers — provided at first no opportunity to negotiate any exemption to the HHS mandate. In fact, with the

success of obtaining a preliminary injunction, Medica could not and would not be convinced of the protections of a preliminary injunction from feared negative and costly repercussions from violating the ACA and the HHS mandate by making an exemption if Hall lost his federal case. A greater result from Hall's litigation had to occur and confirmed by the district court.

71.     Here, I had no choice but to immediately begin summary judgment work for injunctive relief and to prove up Hall's other constitutional claims while seeking an avenue to work through Minnesota's Department of Commerce (the regulatory agency that approved insurance provisions of insurance companies doing business in Minnesota) and negotiating with Medica to meet Hall's needs. Multiple drafts of the supporting memorandum were exchanged between  Dickey, Grzybek and me prior to the anticipated filing. Although not customary in fee petitions, we have provided this Court with one of the drafts of the summary judgment and declaration from the Archdiocese to show part of what was occurring behind the scenes in the eventual successful litigation strategy for Hall.  Attached as **Exhibit 9** is a copy of the draft summary judgment motion.

72.     In short, Hall obtained an extraordinary result in Minnesota. Unlike other states, Minnesota's regulation of group insurance made Hall's claims against the ACA and the-HHS mandate litigation in Minnesota practically impossible. Under Minnesota law, only six non-profit insurance companies can sell group health insurance: Blue Cross Blue Shield, Medica, Preferred One Health, Humana, Health Partners, Humana, and Assurant.

73.     All of these companies must have their group health insurance forms approved by

the Minnesota Department of Commerce prior to sale. At the time of Hall's filing of his complaint in district court, none of those forms provided for a possible exemption for an insured with a preliminary injunction against the application of the HHS mandate. Thus, the injunction was worthless to the insured because the non-profit health insurance company would not accommodate an exemption to mandate. The Eighth Circuit in the *Annex Medical* case further opined that an injunction against the HHS mandate was not appropriate in Minnesota without proof that an insurance company would provide a religious accommodation to the plaintiff-insured once an injunction was secured.

74.    However, Hall succeeded. Here, Hall's American Mfg Company was the first corporation to have one of Minnesota's six non-profit insurance companies provide coverage with a religious accommodation exemption from the HHS mandate. As we previously noted, without the Medica religious accommodation, Hall's lawsuit would have suffered the same fate as Annex Medical under the Eight Circuit decision in that case: no injunction, no religious accommodation.

75.    That success bred other successes. After Hall, six other cases filed in Minnesota's federal district court reached similar successful results.  Attached as **Exhibit 10** are copies of the judgments filed in five of these cases.

76.    As previously noted above, courts have also identified several other *Johnson* factors in determining the reasonableness of a §1988 attorney fee application. For instance, this Court has held that a factor in examining the amount of time expended in a constitutional case is whether the case will benefit the public generally. Here, not only

did Hall's case immediately benefit the public as to the remaining six Minnesota federal cases asserting the same claims, but also generally as it was the first successful case in this Court because of the *Annex Medical* outcome which remains in a state of litigation uncertainty. Likewise, any similar entity or party in Hall's position, now have a clear path to achieve their respective desired result without large expenditures of attorney's fees or costs.

77.     Nevertheless, as the same Hall defendants vigorously fought similar legal issues in *Burwell v. Hobby Lobby*, a case ultimately decided in the U.S. Supreme Court, Hall sought to curtail expenses but meet the anticipated vigorous resistance of the federal government. For instance, as *Hobby Lobby* progressed in the Supreme Court, Hall's counsel agreed to stay litigation until a Supreme Court ruling -- thus significantly reducing Halls' attorney fees until the Supreme Court dissolution. We note that the Hall complaint was filed and served on February 5, 2013, and the preliminary injunction issued on April 2, 2013 in district court. Meanwhile, *Burwell v. Hobby Lobby's* petition for a writ of certiorari before the Supreme Court was filed on September 19, 2013, granted on November 26, 2013, and argument heard on March 25, 2014. The Court's decision was published on June 30, 2014.

78.     As alluded to before, the complexity of the Hall matter is deceiving if one reviews only the district court docket. Legal and factual complexities of civil rights litigation are factors for courts to consider in the award of attorney's fees and determining the expenditure of time devoted to these types of cases where, for instance, extensive legal

23

research is necessary in order that the client's case can be properly prepared. This factor is particularly relevant here. The facts regarding Hall for example, were different than all the other cases because he is a deacon of the Roman Catholic Church. As a deacon, Hall not only earns his income operating American Mfg Company, but the company is an extension of his faith and responsibilities to his employees. These unique facts gave way to extensive legal research on whether Hall could prevail and how to litigate, if at all, where Annex Medical had failed in the district court and in the appellate court. Thus, extensive research was necessary on complex issues of constitutional and statutory law.

79.    As noted, two seminal cases regarding the ACA and the HHS mandate were found in *Hobby Lobby* (originally filed in September 2012) and *Conestoga Woods* (originally filed in December 2012). Hall filed his matter in district court in February 2013, less than six months after these seminal cases. Despite other filings in late December 2012 of similar cases throughout the country, the Hall's filing remains in the early filing category. Further, Hall's pleadings were not "templates" of prior pleadings considering the unique development of the facts and theories of relief that were, in many respects, original and early in the course of these many cases. Hall, of course continues to remain unique wherein he is the only secular employer company owned by an ordained minister.

80.    Since this Court's judgment, we have expended time and expense preparing this Motion for Attorney Fees of ten and one-half hours by me.  The total amount of attorneys sought for preparing the Motion for Attorney Fees is $9,750.00.  Attached as **Exhibit 12** is the invoice for these legal services.

81.    Therefore, Plaintiffs regarding MKE law firm attorney's fee seek recovery of $78,420 in MKE attorney fees and $459.51 in costs as prevailing party in the above-captioned matter.

I affirm under penalty of perjury that the foregoing is true and correct. Executed on this 11th day of March, 2015.

s/Erick G. Kaardal
Erick G. Kaardal